# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

- - - - - - - - - - - - - - :

PATRICK THOMPSON,                    :

                                     :

            Plaintiff,        : CASE NO.

                                     :

                             : 125-cv-01867-PTG-IDD

vs.                                  :

                                     :

BLOOMBERG INDUSTRY GROUP,    :

                                     :

            Defendant.        :

                                     :

- - - - - - - - - - - - - - :

DEPOSITION OF PATRICK THOMPSON

DATE:                June 8, 2026

TIME:                11:03 a.m.

LOCATION:            Morgan Lewis & Bockius
                     1111 Pennsylvania Avenue NW
                     Washington, DC 20004

REPORTED BY:         Constance H. Rhodes
                     Reporter, Notary

Veritext Legal Solutions
1250 Eye Street, Northwest
Washington, DC 20005

Page 2

                    A P P E A R A N C E

On behalf of Plaintiff:

        JOSHUA ERLICH, ESQUIRE
        The Erlich Law Firm
        1550 Wilson Boulevard
        Suite 700
        Arlington, Virginia 22209
        Jerlich@erlichlawoffice.com

On behalf of Defendant:

        DONALD ENGLISH, ESQUIRE
        GABRIELLA RAVIDA , ESQUIRE
        Morgan Lewis & Bockius
        1111 Pennsylvania Avenue, NW
        Washington, DC 20004
        Donald.english@morganlewis.com

ALSO PRESENT:

        Robert Leonard, Videographer
        Peter Sherman, Bloomberg
        Caitlin McDonald, Bloomberg
        Carolyn Jones
        Cameron Hines
                        *  *  *  *  *

Page 12

Q    Where did -- where was your mom living at that time?

A    My mom lived in South Carolina as well in a town called Anderson.

Q    And I'm not as familiar with the geography of South Carolina as I should be.  How far is Anderson from Greenville?

A    I'd say around an hour.

Q    Is your mom still living in Anderson?

A    She is.

Q    And so she was getting -- you said had some surgeries that were being scheduled.  And was it your intention, I guess, to be around for those surgeries?

A    Yes, sir.

Q    When were those surgeries?

A    They ranged.  Early 2024, January, she had --

Q    You don't have to tell me what -- what she -- what she had.  Do you want to just tell me kind of when the surgeries were?  That's enough.

A    Yeah.  Early January 2024.

Page 13

Q    Okay.

A    Or excuse me.  Sorry.  Early 2024, the first in January.

Q    First quarter of --

A    That sounds accurate.

Q    -- 2024 she had a series of surgeries? Is that fair to day?

A    That sounds accurate, yes.

Q    And you wanted to take FMLA leave to be able to be around for your mother?

A    Yeah.  So one of the options that I exploring was FMLA leave.  And I reached out to a gentleman at Bloomberg, Mr. Meriweather, to discuss that as an option.  So yes.

Q    And nowhere -- during that conversation you didn't talk about any disability accommodation that you needed for any condition that you had, right?

A    I don't recall a hundred percent with Mr. Meriweather, but I believe it was focused on the FMLA process and what other options were available to me.  I was really looking for some

Page 14

support from Bloomberg on how they would recommend that I proceed and what options were there.

Q    You said Mr. Meriweather.  I'm referring to your meeting with Will Matthews.

A    With Will Matthews.  Yeah.  I don't know that either of us was very knowledgeable about FMLA.  I more or less just shared the news with him about my mom and the cancer, and he had said basically kind of like what you did.  "I'm sorry to hear that."  And he said do what you need to do to take care of your mom.

Q    He told me you could work remotely due to your mom's situation, right?

A    Yes.

Q    But -- I guess I want to be clear on this point.  At no point during that conversation did you mention to him that you needed leave for a disability that you had?

A    Not during that conversation, no.

Q    And when he told you you could work remotely, he told you on a short-term basis; is that right?

Page 15

A    I don't recall.

Q    It wasn't indefinite, was it?

A    I didn't believe it to be indefinite, but that wasn't a question that we discussed.  It was more so just, hey, you know, the words that I remember were do what you need to do.

Q    Okay.  Did he tell you that you needed to connect with the benefits department if you wanted to kind of have an extended remote work situation?

A    Yes, sir.  He said -- well, there was no conversation around extended work, I don't think.

Q    But he referred you to benefits?

A    Yes, sir.

Q    Did you go to benefits?

A    I submitted a ticket to benefits.

Q    Did you talk to anyone from benefits?

A    Mr. Meriweather was the first person.

Q    That's the conversation with Mr. Meriweather?

A    Yes, sir.

Q    And we'll get to that in a second.

Page 40

MR. ERLICH:  This is 5, but what you read is not on page 9.

MR. ENGLISH:  I'll move on while we try to figure out which transcript pages are missing from this transcript.

BY MR. ENGLISH:

Q    But do you recall her offering you different resources in terms of short-term disability, FMLA, and ADA, and offering to help you through the process?

A    Can you --

Q    Do you recall her offering to help you through the process of you trying to seek an accommodation of working remotely?

A    Yeah.  We said we would be in contact.

Q    All right.  Now, at some point you submitted your ADA form; is that right?

A    That is correct.  I submitted two ADA forms.

Q    We'll talk about those in a second.

(THOMPSON Exhibit Number 7 was marked for identification.)

Page 41

So Exhibit 7, this is an email from you to Fatima Abdeldaim dated February 27, 2024.  And you say:  Please see the attached INDG accommodation form and let me know if there are any questions.  Do you see that?

A    Yes.  I see that.

Q    So after meeting with Fatima on January 11th, you then I guess -- and she tells you to submit the form, you then submitted the form about a month and a half later?

A    Yes.  She told me to read through the form and let her know if I had any questions.

Q    Why did it take you a month and a half to submit the form?

A    Kind of working with Will at that time, and he was letting me work from home remotely. And when that kind of -- basically when I talked with Will, he said, hey, we're starting to get questions.  You need to submit the form.  So I submitted the form.

Q    So Will was -- Will, when he said -- told you they were starting to get questions is

Page 42

because you weren't complying with the attendance policy?

A    Which attendance policy are you referring to?

Q    INDG's attendance policy in terms of being in the office four days a week.

A    I've never seen a full comprehensive policy of attendance.

Q    What is your understanding of the requirement to be in the office?

A    My understanding really changed throughout my employment at Bloomberg.  But it started full remote.  You were allowed to work full remote during Covid.  And then I believe it -- don't hold me to it -- it was two days a week.  It was progressing more.

Q    At this time what was it?

A    In --

Q    You were the one seeking the accommodation, right?

A    Yup.  In January of 2024 the expectation, I guess, for what they would like

Page 43

people to be was come in four days a week.  If there's any questions work with your manager was my understanding of the policy -- or what they were calling a policy.

Q    Okay.  So there was a -- there was a requirement to be in the office four days a week, right?

A    There was a preference to have people --

Q    When you say preference, was it a requirement or was it a preference?  Did you understand that you were required to do so?  Because you were the one trying to get an exception to the policy through this ADA accommodation request, right?

A    So I just want to be clear.  What Bloomberg calls a policy is an email from the CEO. And, yes, I understood that they have a -- I think they called it an in-office schedule of four days a week.

But after I reviewed on Be Home, I was never able to find a policy referring to in-office work and exceptions and how to work with people for

Page 44

that.  But there were some FAQs that were sent around, and they said work with your manager if you need any sort of exception.  So that's what I had done.  And I in fact requested this policy -- I don't know -- probably a year prior about because I was working with hiring folks, and I wanted to be able to provide it as an onboarding document.  And I was never able to get that policy, full policy.  Again, Bloomberg has a policy on how to write policies.  There was no policy with a capital P that was provided to me.

Q    Mr. Matthews told you you were required to be in the office four days a week, right?

A    I would need to have a time frame.

Q    End of 2023 and beginning of 2024.

A    No.  I was told in January of 2024 that I could do what I needed to do, and I was able to work from home for a month into February.  Again, conversations with Will.

Q    I understood that he -- I understand that your testimony is that he told you because of your mother's situation that you were able to

Page 45

temporarily work remotely.  But the -- but the exception that you were receiving from him was from the four-day-a-week mandatory in person in the office policy, correct?

A    I'm sorry.  Can you --

Q    But for Mr. Thompson saying you can go ahead and deal with your mother's situation and work remotely for now, putting that aside, the requirement for anyone who didn't ask for an exception was to be in the office four days a week.

A    Yes.  There was an expectation that folks be in the office four days a week unless you've got an exception.

Q    All right.  So going back to Exhibit 7. This is the accommodation form that was submitted, correct?  The first one.

A    Yeah.  I believe so.  It looks accurate.

Q    And it's signed by Sara Kodaras; is that right?

A    That's correct.

Q    And she is the social worker you had

Page 46

been seeing?

A    She was the licensed clinical social worker that I was working with.

Q    And you started seeing her I think you said in January of 2024?

A    That's correct.

Q    And on the first page of this document, it says:  Does the employee have a physical or mental impairment that substantially limits one or more major life activities.

And she said no.  Correct?

A    That box is checked.

Q    She checked that box, right?

A    She checked that box.  Yep.  I did not fill this form out.

Q    If we go back to the complaint, which is Exhibit 6, go to page 9 of the complaint. Paragraph 64 says:  Mr. Thompson is a qualified individual with a disability that substantially limits his major life activities.

Do you see that on page 9 of the complaint?

Page 62

Q    The second sentence, though, is different in that it says client has been seen by a Lyra therapist for over six months.  Right?

A    Correct.

Q    And that was true?

A    Yes.

Q    And number three, the first sentence is the same, where it says:  Client does not indicate any difficulty performing his job.

But the second sentence is added on the March 12th form which says:  Client reports a strong drive to perform his job but expresses concerns in sessions that his stress level is too high.  That's additional information, correct?

A    That's correct.

Q    All right.  And then the answer to number four, the first sentence is correct -- I mean is the same, correct?

A    Yes.

Q    But then she adds additional information where she says the provider cannot advise on accommodations as they see the client remotely and

Page 63

do not know the details of the work environment. It is up to the client and his employer to devise a plan that best meets the client's needs while also meeting work expectations.

Do you see that?

A    I do.

Q    So is it fair to say that your provider on this medical accommodation form does not recommend an accommodation?

A    I think -- again, reading the whole paragraph, the provider was trying to leave room for flexibility for myself and Fatima to work out a plan that worked for both of us.

Q    And I understand the accommodation that you wanted, which is full time indefinite remote, correct?  100 percent indefinite remote?

A    No.  That's not the conversation that I had with Fatima.  I wanted a majority of remote work and I had said that I was going to come into the office as needed, but I wanted more flexibility so I could be, again, in Greenville, South Carolina, to continue to address my anxiety

Page 64

and depression symptoms because -- again, being

colocated alleviated those symptoms.

Q    And that's what you wanted.  But if you
go up to the top of the form, there's a paragraph
at the very top of the form, and the last sentence
says:  We will also need specific details
regarding the recommended accommodation you
suggest.  I guess it's the second-to-last
sentence.  Right?  Do you see that?  We will also
need specific details regarding the recommended
accommodations you suggest.

A    I do, yeah.

Q    She doesn't provide that, does she?

A    She does not.

Q    And then when it says how long will the
employee need the suggested accommodations she
says -- this one's completely changed.  Before, it
says a date cannot be recommended by this
provider.  This one the provider is recommending
treatment, biweekly sessions, for the next four to
six months.  This will allow the client time to
progress in the treatment and see if work

Page 65

accommodations are sufficient.  And so what she's recommending here is that you attend biweekly treatment sessions for four to six months, right?

A    Yes.  She recommends that I see her twice a week.

Q    Did you do that?

A    Yeah.  Like I said, we were seeing each other once or twice a week.

Q    And did your employer allow you to do that?  Did INDG allow you to do those sessions that she's recommending that you attend?

A    I mean I went to see her two times a week if that's the question.

Q    Then if we turn the page, there's an answer to the question in terms of, if yes, please explain what prevents the employee from returning to the office and provide specific recommendation for how the workplace environment could be further accommodated to support the employee for return to the office.

And here she says:  Client indicates increased stress and anxious symptoms related to his

Page 66

work environment.  The provider cannot advise on accommodations as they see the client remotely and do not know the details of the work environment. She says again it's up to the client and the employer to advise a plan that best meets the client's needs, which also -- while also meeting work expectations.

So again, she's not providing any recommend -- she's not recommending any accommodation that you need in order to perform your job.

A    That is what she puts on the form, is that we should work together to reach an accommodation.

Q    And Mr. Thompson, you said, allowed you, at least for the first -- for three and a half months while you were dealing with your mother's surgeries allowed you to work remote full time, right?  Not Mr. Thompson, I'm sorry.  Mr. Matthews.

A    Yes.  My manager.  So that's a long question.

Page 67

Q    Yeah.

A    January, do what you need to do was what he had said.

Q    You were working remotely in December as well, right?

A    That's correct.  Yeah.  However, December was, again, I feel, a separate thing, where I had planned to go to South Carolina to be closer to family for the Christmas holiday.  And I had gotten approval for that from Will.  As we moved into January we had January 2nd, January 3rd meeting -- I don't remember the date but I met with Will.  And that's when he said do what you need to do.

As we progressed into February, he said we need to fill out the form.  You know, people are asking questions.  We need to -- and I'm obligated to remind you that you are supposed to be in the office four days a week.  And that has -- yeah, that's kind of how things progressed.

Q    So he did tell you that you were obligated to be in the office four days a week,

Page 68

right?

A    Yes.  I mean, again, depending on the time frame.  But yes.

Q    In that time frame.  In February of 2024?

A    Yes.  In later February of 2024.

Q    But nonetheless, January, February, and March you were working remotely?

A    That's correct.

Q    And it's your testimony that Mr. Matthews permitted you to work remotely in order to deal with your mother's situation, right?

A    For a time frame, yes.  Again --

Q    And it was your testimony that your mother's surgeries were in the first quarter of 2024, right?

A    Yes.  She had surgeries in that time frame, yes.

Q    And so at that stage, once those surgeries are no longer occurring after the first quarter of 2024, there's no longer a need to work remotely as it relates to your mother's condition,

Page 69

correct?

A    I don't know.  Again, I was working remotely to deal with my conditions, and she had her surgeries in, again, early 2024.  And then there was additional treatment.  Again, you know just surgery --

Q    Of course.

A    So yeah.  My initial -- and again, the conversations I had, I wasn't asking for just full work remote forever.  I was working -- I was asking for an accommodation for this.  And then once those symptoms improved, I was happy to go back to the office.  And I was happy to go into the office even during this period as needed. Again, I was trying to be flexible with Bloomberg and reach an accommodation that worked for everybody.

Q    But I just want to be clear.  What you told Will Matthews was that you needed to work remotely to deal with your mother's condition and these surgeries that she had coming up, right?

A    Yes.

Page 70

Q     And he let you do that.

A     Yes.  I believe.  I mean --

Q     And then when you met with Fatima in January you told her that you needed to work remotely to deal with your mother's surgeries, correct?

A     There were several conversations with Fatima, but yes, we -- I had said, again, to help deal with my symptoms.  My mother's -- my mother's health was something that inflamed my symptoms.  Being closer helped alleviate the whole condition.

Q     Okay.  And I don't want to, you know, read through the transcripts.  And, you know, the recordings say what they say.  But you would agree with me that when you spoke to Fatima and Will Matthews in January, you didn't mention your symptoms.  You talked about your mother's condition and your need to be closer to her to help her through the difficult appointments and procedures that she was going through.

A     Yeah.  That was the thing I was fixated on, yes.

Page 83

reading the next section that I usually go to --

one more minute -- so it doesn't look like your

provider made any recommendations per se.  They

seem to be leaving it at your discretion -- and

then she says -- which is weird because that's not

normally what it does when I'm looking at the

response to the question number four.

So she tells you that there's -- there's

no recommendation, right?

A    Yeah.  That's what she says.

Q    And then go to page 6.  At the bottom

she says -- you say, so I'm looking -- she asks,

Most providers provide recommendations.  Hence,

why I am asking you what are you looking for

exactly because there's none provided on the form.

And then you say:  I'm looking to continue kind of

the accommodations that we had going on for the

last three months because that will allow me to,

you know, attend the responsibilities that I have

outside of work.

And then she asked you who authorized the

one you are claiming and that you've had for the

Page 84

last three months?

Then you say, I'm not saying that I've had an authorization.  I'm saying that it happened and that what happens with life sometimes and you have to make decisions.

So I want to stop there.  Did you not have authorization to be working remotely?

A    In March of 2026?

Q    Yeah.  For those three and a half months.

A    They wanted me to come back into the office.

Q    But you were still working remotely; is that correct?

A    That's correct.

Q    Nobody fired you in March for doing -- when did Will tell you you need to come back?

A    I don't have a date, but I would say February or early March.

Q    And you kept working remotely as you were going through this accommodation request process, right?

Page 85

A    Yes, sir.

Q    And you end up saying that Will has been very studious in saying, hey, I'm obligated to remind you that, per policy, you are supposed to be in the office, you know, X days a week.  So he reminded you of that, right?

A    Yeah.  I -- yeah.  Will -- again, the conversations Will and I had mostly focused on work.  And it would always just kind of be a passing thing at the end of meetings.  It's like, hey, by the way, again, this is a thing that's ongoing.  I need to remind you.

Q    And she says to you that you are indicating to me that you would like to continue on this unauthorized remote work that you've been doing for the last three months and just have that continue.

And you respond by saying:  That would be preferable to me, yes.

And then she says:  I'll take that information to the committee.

Is that your recollection of the

Page 86

conversation?

A    Which page is this on?  I mean I assume it's correct, but I just want to follow.

Q    At the top of page 7:  I'm trying to understand where did the accommodation come from and who authorized it.

And she says, you know, you took it upon yourself to work and there you say nothing has been authorized.  Do you see that?

A    I do.  Yeah.

Q    And you agree that you wanted to continue kind of the status quo of continuing to be doing what you had been doing --

A    Yes, sir.

Q    -- at this stage.  Okay.  I think since we are running out of time, this is a good breaking point.

VIDEOGRAPHER:  Going off the record at 12:49 Eastern time.

(Whereupon, a luncheon recess was

taken.)

* * * * *

Page 87

AFTERNOON SESSION

(1:19 p.m.)

VIDEOGRAPHER:  This is video file number two.  We're back on the record at 1:19 p.m. Eastern time.  You may begin.

WHEREUPON,

PATRICK THOMPSON

was called for continued examination, and having been previously duly sworn, was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT CONTINUED

BY MR. ENGLISH:

Q    All right.  I'm going to go back to Exhibit 6, which is the complaint.  I want to turn to paragraph 29.  Let me know when you are there.

MR. ERLICH:  You say paragraph 29?

MR. ENGLISH:  Paragraph 29, page 4.  Are you there?

THE WITNESS:  Yes, sir.

BY MR. ENGLISH:

Q    This paragraph says that this

Page 174

Q    When you say you needed to be there to interpret, you know, what the doctor is saying, many of us have done that for our parents or loved ones.  Was your dad also able to do that?

A    Yes.  I suppose he would be capable of that.

Q    Now, you were already allowed to work one day remote a week, right?

A    Yes, sir.

Q    So given that you need to attend -- you wanted to attend appointments with her once a month, wouldn't having essentially four days a month where you can work remotely -- isn't that -- doesn't that allow you to attend these appointments and still adhere to the policy?

A    Yeah.  If it was just the appointments.  But again, it's -- there's a convenience factor there, too.  Of course, I'm not going to deny that.  It's nice to be close to family to be able to do family things and appointments.

Q    But you are going to -- you are -- you're going to admit that it's -- you know, you

Page 175

wanted to be closer, an hour away --

A    Yes, sir.

Q    -- rather than how far we are from South Carolina in DC, rather than, you know, a short plane ride away to your parents?

A    Yes, sir.

Q    But you are not going to admit that it had anything to do with your soon-to-be wife that you were living with or that you had moved in with in South Carolina?

A    I mean I wouldn't say that.  It was -- like I said, there were conveniences to being in South Carolina.  I'm not going to deny that.

Q    And it had of nothing to do with your South -- you were registered to do business in South Carolina?

A    Yes, sir.

Q    It had nothing to do with your South Carolina business that you were running?

A    That, I feel is a slightly different story.  Again, I started the business as kind of a backup plan in case something happened with

Page 176

Bloomberg.  I would like to have something to do with my time and be able to have income if I was to be let go from Bloomberg.  So again, that role, I'd have no problem shutting it back down.  Like it was in its infancy.  So it's no problem to me to cancel that.  Meanwhile, revenue didn't start for that until the latter half of 2024.  So it's something that I was --

Q    What revenue did you have the first four months of 2024?

A    I don't know off the top of my head.  I can tell you it was less than a thousand dollars. That's being generous.

Q    I'm not talking profit.  I mean revenue.

A    Yeah.

Q    After you were terminated in April 2024, did you look for jobs?

A    I had some conversations on LinkedIn, but there was no, you know, meaningful pursuit of other product manager roles.

Q    Why not?

A    I decided to go all in on the business.

Page 177

It was what I was doing.  I wanted to give it a try.

Q    How much were you making at INDG before you left?

A    Salary?

Q    Yeah.

A    180, 190.

Q    What did you clear in 2023, your last year there?

A    I'd have to look at my tax returns, but I would say around 200, plus or minus 10 percent.

Q    And what did you clear last year with your new business?

A    Tax year 2025?

Q    2025.

A    We had about $60,000 of discretionary earnings.

Q    By 60,000 of discretionary earnings, meaning profit above costs?

A    Yes.

Q    Okay.  Did you -- including in the costs of the business, did you take a salary?